TABLE OF CONTENTS

POST CONVICTION RELIEF (1/21/04):

Page 2

| WITNESSES: | VOL | DIRECT | CROSS | REDIRECT | RECROSS |
| --- | --- | --- | --- | --- | --- |
| FOR THE PLAINTIFF: | | | | | |
| Lance Christian Wells (Telephonically) | I | 3 | 11 | 36 | 39 |
| FOR THE DEFENDANT: | | | | | |
| Eric J. Holden | I | 42 | 64 | - | - |

POST CONVICTION RELIEF

BEFORE THE HONORABLE ERIC SMITH

Superior Court Judge

Palmer, Alaska

January 21, 2004

10:16 o'clock a.m.

APPEARANCES:

FOR THE PLAINTIFF: EUGENE B. CYRUS
Law Office of
Eugene B. Cyrus, PC
13135 Old Glenn Highway
Suite 205
Eagle River, Alaska

FOR THE DEFENDANT: RACHEL K. GERNAT
Assistant District Attorney
11921 Palmer-Wasilla
Highway, Suite 100
Palmer, Alaska

PROCEEDINGS

3PA04-19

10:16:45

THE CLERK: We're on record.

THE COURT: All right. State -- this is Eric Holden v. State. Says -- it's a PCR, 3PA-02-916 CI. This is a hearing on the PCR. We have Mr. Wells on the phone.

MR. WELLS: Good morning.

THE COURT: Good morning. I guess in the interests of time, we'll just swear him in and get his testimony and then we can move on from there.

MS. GERNAT: Right.

THE COURT: Mr. Wells, if you'll raise your right hand.

MR. WELLS: Okay, it's raised.

(Oath administered)

MR. WELLS: Yes, sir.

LANCE CHRISTIAN WELLS

called as a witness on behalf of the plaintiff, testified telephonically as follows on:

DIRECT EXAMINATION

THE COURT: Okay. You can put your hand back down. Will you state your name for the record and spell your last name?

A Lance Christian Wells, W-e-l-l-s.

THE COURT: And your occupation?

A Attorney.

THE COURT: All right. Ms. Gernat.

MS. GERNAT: Thank you, Your Honor. Your Honor, I suppose we can -- I can dismiss all the formalities of when he represented Mr. Holden and just get right to the issue?

THE COURT: If that's all right with Mr. Cyrus, yeah.

MR. CYRUS: Yes, I think the court file.....

THE COURT: It's in his affidavit.

MR. CYRUS: .....reflects.....

THE COURT: Yeah. Go ahead.

MR. CYRUS: .....all the necessary.....

MS. GERNAT: Thank you.

MR. CYRUS: .....items.

THE COURT: Go ahead.

BY MS. GERNAT:

Q Mr. Wells, basically I just need to ask you some questions in followup of your affidavit that you submitted in this PCR case.

A I -- I guess one thing before we start, Ms. Gernat, is.....

Q Sure.

A .....I think we're going to need an -- a waiver of attorney-client privilege at this point.

MR. CYRUS: Well, we -- certainly. That was a -- that's understood, Judge.

THE COURT: Okay. It's waived.

A That's fine. Go ahead, ma'am.

Q Okay, thank you, Mr. Wells. The issue here -- when you filed -- going back to the case in which you represented Mr. Holden on his misdemeanor DUI, you filed a motion to dismiss the case, is that correct?

A I -- I don't have a copy of the motion, but it was either a motion to dismiss or a motion to suppress, yes.

Q And do you recall what the crux of that motion was?

A Him not being able to contact an attorney from the jail -- or not -- I shouldn't say from the jail. From the -- where he was transported to for the Intoximeter.

Q Do -- and in filing that motion, what would you have reviewed to determine if there should be a motion filed and what the merit of the motion would be?

A Well, first of all, I would always start with interviewing my client. And Mr. Holden, I certainly met with him on several occasions to discuss the case. It would also include a review of the police reports, which would include the officers' reports who were involved in it as well as a review of the tape that was made at the station house there where he was asked to provide a copy -- or a sample of his breath.

Q And you did that in this case?

A Oh, absolutely, and reviewed it with Mr. Holden as well.

Q And do you recall what it was you determined the merits

Ex. J, p. 2

of your motion would be?
A Well, frankly, I didn't -- I -- the -- the merits of the motion -- and -- and it was kind of a stretch, actually, but it -- it -- it was the fact that Mr. Holden kept insisting he was not able to contact his attorney. It was similar as to what happened then -- I believe it was his prior D -- DUI as well.
Q And you said it was a stretch?
A Right.
Q Why did you say that?
A Well, the -- the issue didn't appear to be a very good issue. Mr. Holden had kept wanting to make a call, as I recall -- and I don't have that tape in front of me or a transcript of it. No one provided me with it. I think there was one at one time. But Mr. Holden ultimately, as I recall, was allowed to use the phone. It -- it was not the best scenario insofar as from a defense perspective. Mr. Holden was very belligerent and somewhat antagonistic to the officer, as I recall from my recollection of that tape.
Q Okay.
A May.....
Q At any point did you notice that there was an issue regarding him requesting to call a friend and not being allowed to do so?

A Well, that would be, as I recall, the Zupnik case that controls that. Mr. Holden and I discussed friends, relatives. Mr. Holden was insistent that he was not allowed to contact an attorney. However, I did in my motion reference Zupnik just in case, because I knew Mr. Holden was going to testify in that suppression hearing.
Q And so what was the purpose -- if you can state what your purpose for citing Zupnik was, then?
A The purpose of Zupnik basically was, I included it in my motion just as formal briefing. Most times, whenever I find myself where somebody, quote, is alleging they're not allowed to call an attorney, but also probably, most likely, in Mr. Holden's case did include an issue as to whether or not he wasn't allowed to contact a friend or a relative, that type of thing.
Q Okay. Did you make that a separate section of your motion or mostly by reference?
A It was cited to in the motion to -- and it was a motion to dismiss. It -- there was a cite to it in there.
Q Okay.
A And I think -- and again, I don't have the motion in front of me. I believe it was actually raised in the motion. At some point it might have been in a reply brief.
Q Okay. But that was not the main part of your motion?

A Oh, the crux of this was -- was, I wasn't allowed to call my attorney. It wasn't, I couldn't call my friend, I couldn't call my mother or my brother. It was, they didn't let me call my -- my lawyer. That was.....
Q And.....
A That was the crux of it. I mean, the -- this -- this pattern developed with Mr. Holden. This -- this -- and when I say that, it -- it occurred in the other -- another DUI case that I had with him as well where, you know, it was the allegation, I wasn't allowed to call my lawyer. It became a familiar theme.
Q And you made this determination, as you said, after review of all of the information that you received?
A Well, not only was it after review of all the information, but it became -- after I met and discussed the issue with Mr. Holden, as I recall, he was in custody at that point in time. And that was a Palmer case, and I'm going to say that that was at Mat-Su Pretrial.
Q And there was an evidentiary hearing on.....
A Oh, yes.
Q .....this case?
A Oh, yes.
Q And Mr. Holden testify?
A Oh, yes.
Q And do you recall what the crux of his testimony was?

A He wasn't allowed to call his lawyer.
Q And ultimately, Magistrate Wells, who was sitting in as the district court, found -- denied your motion?
A As I recall, it was Magistrate Wells out of Anchorage, and it wasn't just, I believe, a one-day suppression hearing. I believe it was broken down into a couple of different days (indiscernible - foreground noise) went back. And I know Mr. Holden did testify and he certainly was subject to cross examination. And -- yes, and ultimately the motion was denied.
Q I think I'm done. I.....
THE COURT: I think they need to talk to you. Are.....
MS. GERNAT: Oh, okay.
THE COURT: .....you done -- yeah. You just -- I'll tell when -- it's not.....
MS. GERNAT: Just so you know, Mr. Wells, that we had to bring a client in to accommodate Ms. Foster's trial schedule, so we might have to take a break in a minute.
A That's fine.
MS. GERNAT: Your Honor, I have nothing further for Mr. Wells.
MR. CYRUS: If I could look at the underlying file, 07 -- 00488, while you take care of this other matter, it might expedite.....
THE COURT: I don't have that here.

Ex. J, p. 3

MR. CYRUS: .....my question.....
THE COURT: We need to get that.
THE CLERK: 048.....
MR. CYRUS: 8 -- I think 0488 is the underlying case -- yeah, 0488, 004488.
THE COURT: Couldn't be a 4488. We don't have that many.....
MS. GERNAT: It's.....
THE COURT: .....here.
MS. GERNAT: .....00488.
THE COURT: 00488.
MR. CYRUS: Yeah.
10:24:40
(Other matters)
10:34:20
THE COURT: All right. Mr. Wells, you still with us?
A I am.
THE COURT: Okay. Mr. Cyrus, you wanted to look at this?
MR. CYRUS: Yes. Yes, I did, just to ask some questions from it.
THE COURT: We're done.
UNIDENTIFIED SPEAKER: Thank you, Your Honor.
THE COURT: Yeah.
MS. GERNAT: Are we resuming on Mr. Holden or.....
THE COURT: We're resuming on Mr. Holden's case, 99 -- 02-916 CI.
MS. GERNAT: Mr. Wells, are you still there?
A I'm here.
MS. GERNAT: Okay.

LANCE CHRISTIAN WELLS

testified as follows on:

CROSS EXAMINATION

BY MR. CYRUS:
Q Mr. Wells, by any chance did you get from archive your file on this?
A No.
Q Okay. So you're just relying on your memory then?
A I'm relying on my memory and the affidavits that I have in front of me, and that's all the information I have, yeah. No -- no one's provided me with any briefing or anything at this point.
Q Okay. And you're familiar -- so then I gather you're familiar with the Zupnik issue from your years of experience doing defense work then. Am I correct?
A Yes.
Q All right. I'm just trying -- I'm going through the file now where you requested an evidentiary hearing.....
A Okay.
Q .....on your motion to suppress. And I'm trying to locate the motion right now. Yes, it looks like it's a motion to dismiss.....
A Uh-huh (affirmative).
Q .....in 00488. Does that refresh your recollection as a motion to dismiss for the -- I guess you were trying to dismiss the refusal count, or both charges.....
A Everything.
Q .....the refusal count?
A As I recall, I believe he had a DUI and a refusal.
Q Okay. Okay. Okay.
A I think he ultimately pled to refusal.
Q Right. Okay. So now -- so you were aware of Zupnik, then, is that correct?
MS. GERNAT: Objection. Asked and answered.
THE COURT: Sustained.
Q In fact, you cited Zupnik in your reply -- in your motion on page 5?
A I don't have a copy of the motion.
Q Okay.
A I looked at my computer copies of the motions earlier, probably a couple of weeks back. And I did see that Zupnik was cited, yes, sir.
Q Okay. And it's cited in this context: If a person is arrested for driving while intox -- and requests to contact an attorney, the police must afford the arrestee a reasonable opportunity to contact an attorney before the police require the arrestee to desire whether he take the breath test mandated by A.S. 28.35.032. Then you cited Copeland. That's the major case, isn't it?
A If -- if that's what my motion says, sir. You -- you have a copy of it.....
Q Right, I do, and.....
A .....in front of you.
Q .....I'm just reading it for the record. And the.....
MS. GERNAT: Well, Your Honor, I'm going to object to that. The court has the motions and the court can refer to them. And reading it to Mr. Wells isn't a question. He read it to Mr. Wells.....
THE COURT: I'm going to overrule that, because it's refreshing.....
MR. CYRUS: So.....
THE COURT: .....Mr. Wells's recollection as to what he said, since he doesn't have the motion.
MR. CYRUS: All right.
Q So you cited Copeland, and you understand that's the major case on right to contact an attorney?
A Yes.
Q Okay. Then you also cited: However, this right to -- then the next sentence you wrote: However, this right to contact -- is not an absolute right, but rather a limited one of reasonable time and opportunity. Then you cite

Copeland, you cite Kameroff, and you cite Zupnik for that proposition.
A Okay.
Q Okay. So are you telling the court that you raised Zupnik specifically that he was refuse -- that -- by that cite, that he was refused to make more than one call and allowed to call an attorney? Are you saying by that cite you raised it with the court?
A I raised the issue that Mr. Holden had me raise, sir.
Q Okay.
A And that was the issue that Mr. Holden specifically was not allowed to contact his attorney.
Q All right.
A Mr. Holden -- go ahead, I'm sorry. I don't -- I don't want to.....
Q No, no, you're.....
A .....ramble on.....
Q You're doing fine. You're doing -- go ahead and finish it off. I don't mean to cut you off.
A No, that's -- that's fine. That's -- that's all I had to say on (indiscernible - voice too low).
Q Okay. All right. Well -- so I'm gathering that -- did you see the Zupnik issue there or not see a Zupnik issue?
A Well.....
Q I -- I'm not certain I.....

A Well, let -- let me say this. I'm certainly familiar with Zupnik and I'm certainly familiar with Copeland, and I was before this case transpired. In my meetings with Mr. Holden, in my review of the police reports, in my review of the audiotape which was made at -- at the time of Mr. Holden's arrest downtown, when they do the observation period, that type of thing, that's when, after reviewing that information and discussing it with Mr. Holden, he had me or asked me to at that point in time -- we discussed and I agreed to file on his behalf a motion to dismiss based on what he insisted was a violation of his rights to be able to contact an attorney.
If you're asking me if I considered the Zupnik issue, the answer's absolutely, I did consider the issue. However, I didn't consider a Zupnik issue as a -- a real issue here, and I -- in the way I looked at this case. So it would be -- the main issue and the only issue Mr. Holden wanted to press was that he wasn't allowed to call his attorney. And I looked at that as a very long stretch.
Q Okay. So let me understand this correctly. So you were aware of Zupnik, you were aware of Zupnik issues potentially in a DWI. And in this case you looked at this and found no Zupnik issue then?

A I looked at this case and reviewed the tapes. And my decision error, should I say, what was filed was based on a review of the tapes, my interviews with Mr. Holden, and specifically what Mr. Holden wanted filed in this case.
Q Right.
A And that was a motion that he adamantly said that he was not allowed to contact his attorney. And I believe that's consistent with his testimony at the evidentiary hearing as well.
Q Did you see a Zupnik issue or not?
A I didn't see a Zupnik issue that certainly was a winnable Zupnik issue. I.....
Q Okay.
A .....I -- I didn't see any -- any real issue there, no.
Q Okay. So -- and in fact then, you did not raise the Zupnik issue with the court, then?
A I left -- in the motion, because I knew I was going to have an evidentiary hearing on this case -- and because Mr. Holden is somewhat inconsistent in his meetings with me and the way things that transpired, it's always an open issue. However, it was not specifically formally raised that Mr. Holden was not allowed to contact -- I mean, put whoever you want on the end, his mother, his grandmother, whoever it might have been. That issue was not formally raised nor was it -- I don't believe it was

addressed in the motion to suppress during the time we had the evidentiary hearing.
Q So to your.....
A Because that was not the issue that was there.
Q Okay.
A The issue was that he wasn't allowed to call an attorney.
Q All right. All right, so if the log notes indicated there was no testimony concerning denial of a call to a friend or relative, you wouldn't dispute that?
A I -- I couldn't agree or -- or deny it, sir. I.....
Q So.....
A .....I don't have a copy of the log notes, and secondly, I don't believe the log notes are in fact determinative of everything that was said, because.....
Q Right.
A .....at that time, they're -- they're certainly making a recording. And I believe back then it might have been on audiocassette as opposed to CD.
Q And I think we have a CD here in the -- to offer to the court. This does not appear to -- there.....
MS. GERNAT: I'm going to object to the offer of the court. We went through this already about it's like going back and relitigating the evidentiary hearing.
THE COURT: We're not there yet.
MR. CYRUS: Okay.

Ex. J, p. 5

Q Did you -- so it's your testimony you did not make any oral arguments to your memory address.....
A I.....
Q .....addressing this point to Judge.....
A I -- I can't admit.....
Q .....Wells?
A .....or deny that, sir. I don't recall. You never sent me a copy of the transcript.
Q Okay. Finally, the order from the court -- the ruling from the court doesn't discuss the denial of a -- contact a friend or relative. Did you think about ever asking a reconsideration or a reopening for that purpose?
A Sir, there was never an issue as to that, because Mr. Holden, as I recall, never asked to contact a friend or a relative. Mr. Holden, as I recall from a review of the audiotape -- and I'm going from memory because, again, I don't have the tape or a transcript of it -- but he wanted to call an attorney. I don't recall him wanting to call anyone else.
Q Okay.
A He wanted to call an attorney, and they went through a very long, as I -- or fairly lengthy dialog regarding that and the providing of phone books and that type of thing.
Q Okay. So let me read you from the transcript and see if

you overlooked this issue, all right?
MS. GERNAT: Well, Your Honor, I'm going to object, because we've been -- the point is, did he think about it, did he raise it.
THE COURT: Well, I.....
MS. GERNAT: we've been.....
THE COURT: I.....
MS. GERNAT: .....through that.
THE COURT: He just said he didn't think it was on the tape. So Mr. Cyrus is allowed to refresh his recollection as to what's on the tape. If Mr......
A Which tape are we referring to?
THE COURT: Let me just be clear, because Mr. Cyrus is sliding into something I told him not to do, and.....
MS. GERNAT: Exactly.
THE COURT: .....I'm not going to let him do it. And I want to get it on the record now. There are two separate issues, Mr. Cyrus. One issue was whether Mr. Wells thought about it, and the second issue is, if he -- well, there's an issue as to whether he raised it. The next issue -- that -- but that doesn't end the inquiry. The next issue is, did he think about it, all right. And you keep sliding around that. And as I told you the last time and as Ms. Gernat's objection reflects, that issue has to be confronted directly. Now, you can read the transcript to Mr. Wells because it is germane to

that second issue. But do not think that I'm going to let you try to establish a record that does not address that second point. Are we clear?
MR. CYRUS: I'm not sure what you define as the second point.
THE COURT: Point 1: Was it raised? Point 2: Did Mr. Wells think about it or not?
MR. CYRUS: Okay. And that.....
THE COURT: Because if Mr. Wells think.....
MR. CYRUS: .....second point -- this is where.....
THE COURT: That's the second point. And.....
MR. CYRUS: That's what I'm trying to get to, whether he thought about it or not.
THE COURT: Right.
MS. GERNAT: Well, then just ask that. And.....
THE COURT: Well, he can read the transcript.
MS. GERNAT: He hasn't asked him.....
THE COURT: The objection.....
MS. GERNAT: .....that yet.
THE COURT: Well, he did, and Mr. Wells said yes. But then Mr. Wells also said that it wasn't in the tape. So we can address that point. Go ahead and read the tape.
MR. CYRUS: Okay.
THE COURT: Or the transcript of the tape.
MR. CYRUS: The transcript, yes, thank you.

THE COURT: And who prepared this transcript?
MR. CYRUS: This actually came from the district attorney's office.
THE COURT: Okay. I just need for the record to know where it came from.
MR. CYRUS: But it -- it's attached to their motion in the oh.....
THE COURT: All right. Can I have that file back, please?
MR. CYRUS: Yeah, yeah. It's attached to the motion -- attached to their opposition -- well, it's actually incorporated in their opposition.
THE COURT: Anyway, if you -- and what page are you reading from?
MR. CYRUS: I'm reading from their opposition, about third page. I guess the transcript doesn't say what page it is. I'm guessing about the third or fourth page. Yeah, they don't -- they didn't number their pages.
A Gene, which transcript are we referring to?
Q Your -- sir -- counsel, I'm referring to the transcript of the.....
A Is it the DUI processing?
Q .....DWI processing or the.....
A Okay.
Q Okay. And it's theirs -- their transcript.

MR. CYRUS: Yeah, I'm -- it's not numbered here, judge -- so I can't help you with a reference here.
THE COURT: All right, if you'll bear with me. I'm trying to find the pleadings here.
MR. CYRUS: Okay.
(Whispered conversation)
MR. CYRUS: Oh, I see why.....
THE COURT: I have the opposition. All right, I see the transcript. Go ahead.
MR. CYRUS: All right.
THE COURT: What line on the page are we looking.....
MR. CYRUS: Yeah. The problem is, the one I'm maybe referring to may be a -- different transcripts attached to a different motion. So I apologize for this. I think at the top of the page (indiscernible - away from microphone). But I may be off a different transcript (indiscernible). Different -- see, there's also one in the PCR file that (indiscernible).
MS. GERNAT: Well, Your Honor, then I would ask that the -- he refer to the court's, so there's not a switching here.
THE COURT: Yeah, I'm comparing what.....
MS. GERNAT: The state will not rely on Mr. Cyrus's.....
THE COURT: .....I have -- let me -- just.....

MS. GERNAT: .....transcript.
THE COURT: .....a minute. Just a minute. Okay, which line on that one are you looking at?
MR. CYRUS: Well, I'm looking at this line here. If you want.....
THE COURT: Line -- so that's line.....
MR. CYRUS: 19.
THE COURT: Okay. Let me look in the back for a minute.
MR. CYRUS: Okay. May be different in that (indiscernible - away from microphone).
THE COURT: Okay, I got it.
MR. CYRUS: Okay.
THE COURT: In the original opposition, it's on the third page of the DA's opposition, and it's around line 11.
MR. CYRUS: Okay, line 11.
THE COURT: Okay. That looks like it might be kind of a cut-and-paste of the transcript that came from, but it's from.....
MR. CYRUS: Yeah.
THE COURT: .....the DA. Go ahead and read.
Q Anyway, the critical portion is: If you want to call your attorney, you are certainly welcome to. Anything else has to wait until we get to Mat-Su Pretrial. That's what Mr. Holden's complaining about, is that he was restricted to a call to his attorney. And he's

complaining that that should have raised a Zupnik issue with you, because earlier he was tell -- you're allowed to make a phone call, given the impression you're allowed one phone call to your attorney.
A Well, I think that statement is probably taken somewhat out of context, Mr. Cyrus, in the facts that -- in the fact that there is numerous statements and numerous deliberations that went back and forth between Mr. Holden and the trooper. The -- the fact was, as I recall, the officer did I believe ultimately give Mr. Holden an opportunity to make a phone call, although I -- I don't specifically remember because I don't have the -- the -- the entire transcript.....
Q Right.
A .....before me.
Q And that -- and that's the point he was trying to make. He was allowed to make a call to an attorney.....
A Well, as -- as I recall, sir, he was allowed to make any call he wanted to.
Q Now, that's the dispute. That's the dispute, okay.
A Yeah.
MS. GERNAT: Your Honor, I'm going to object to.....
MR. CYRUS: I.....
MS. GERNAT: .....Mr. Cyrus arguing with Mr. Wells. He can.....

THE COURT: I'm going to sustain that objection.
MR. CYRUS: All right.
THE COURT: The issue, Mr. Cyrus, that I want you to address at this time.....
MR. CYRUS: Right.
THE COURT: .....is whether Mr. Wells thought about an argument to the magistrate that Mr. Holden was denied his right to call a friend or relative.
MR. CYRUS: Got it. That.....
THE COURT: Right -- I don't want you to get into a debate on whether Mr. Wells's judgment was accurate.
MR. CYRUS: Okay.
THE COURT: I want you to get into a -- I want you to ask him flat-out specifically -- and don't use shorthand like Zupnik. Ask him whether or not he evaluated that issue; if so, what his evaluation was; and if not, why not.
MR. CYRUS: Okay.
THE COURT: All right.
Q Now, Mr. Wells, you agree with me -- before I get to that one question, you agree with me that it's not Mr. Holden's duty to research the law and tell you what legal issues; you're the lawyer that has to spot the legal issues. Isn't -- I'm I correct on that?
A Yes.
Q Okay. In that line we just read.....

Ex. J, p. 7

A Although -- although -- and I'd have to look back again -- Mr. Holden was somewhat of a unique client. I don't recall if he had, quote, co-counsel status in this case or not.
Q Well, even assuming if he had co.....
A I -- I....
Q Does that.....
A .....I just -- I -- I don't recall if -- if he came in or not and -- and wanted -- I -- I just don't recall. I'd have to look back at the file whether or not he -- he was.....
Q Well, let's assume -- let's assume he wanted co-counsel status. Does that in your mind relieve your obligations to recognize legal issues?
A It certainly doesn't relieve me of my obligation, Mr. Cyrus, to recognize legal issues. Go ahead.
Q Okay. Did you see a Zupnik issue when he was told.....
MS. GERNAT: Objection. The court just said not to use the shorthand of Zupnik.
MR. CYRUS: Okay.
THE COURT: Sustained.
MR. CYRUS: Okay, let me rephrase it.
Q Were -- did you recognize an issue of a denial of a right to make a phone call when in the transcript he was told he had to wait -- the Mat-Su.....

MS. GERNAT: Objection, a -- Your Honor, can he just ask the question like the court asked instead of trying.....
THE COURT: He -- I'm.....
MS. GERNAT: .....to finagle his own.....
THE COURT: I'm going to overrule that objection. He can ask the question as he sees fit and I'll take the answer. I mean.....
MR. CYRUS: Sure.
THE COURT: .....we'll get the answer I get.
MR. CYRUS: Okay.
Q In the quoted section we just quoted to you from, page 11.....
THE COURT: No.
Q .....I mean transcript 11.....
MS. GERNAT: No -- Your Honor, I'm going to object.
THE COURT: Now you're past.....
MR. CYRUS: Okay.
THE COURT: I -- you're now debating the quality of his work. I want you to ask him whether or not he evaluated the issue. That's what I kept asking you to do.
MR. CYRUS: Oh, yes, that's what.....
THE COURT: No, you're not. You're asking him whether it arose in this context, and that's a different issue.
MR. CYRUS: Oh, I'm sorry.
THE COURT: I want to find out if he thought about it.

A The answer to that's yes.
THE COURT: Thank you.
MR. CYRUS: Okay. All right. Now I want to.....
THE COURT: Because the quality of his thinking about it -- we now get into what it was -- well, you keep going. But, Mr. Cyrus, keep in mind that we don't second-guess lawyers' thinking in this context, as you admitted the last time we had the hearing. Right?
MR. CYRUS: Yes, we do. We do second-guess lawyers' thinking.
MS. GERNAT: No, we don't, Your Honor.
MR. CYRUS: If there was a tactical decision that's not reasonable, then we second-guess.....
MS. GERNAT: You don't get to go back through and relitigate to see if Mr. Cyrus would have done it differently than Mr. Holden. That is not the standard that.....
THE COURT: The standard is not.....
MS. GERNAT: .....the court must apply.
THE COURT: .....that, you know that, Mr. Cyrus.
MR. CYRUS: Well, I -- standard whether it was unreasonable to overlook.....
THE COURT: It's not.....
MS. GERNAT: No, it's not.
THE COURT: Beyond the limits of competence, I believe is what we're looking at. It has to be utterly incompetent.

MR. CYRUS: Well.....
THE COURT: It can't be.....
MR. CYRUS: .....now.....
THE COURT: .....because you think you would have done it differently. You know that.
MR. CYRUS: No, I believe the test is whether it was a reasonable tactical decision.
MS. GERNAT: That's a -- the -- he.....
THE COURT: Citation, please?
MR. CYRUS: Rischer (ph). That's a Rischer (ph).....
THE COURT: All right. I'll look up Rischer (ph).....
MR. CYRUS: Okay.
THE COURT: .....while you talk to Mr......
MR. CYRUS: Okay.
THE COURT: Mr. -- that's not my understanding of Rischer (ph), because otherwise judges would be second-guessing lawyers up and down.
MR. CYRUS: Oh, I -- that happens, Judge, that we do second-guess lawyers, but it's a very difficult standard. We have to show that it's not reasonable, beyond the scope of what a reasonable attorney would do in the.....
THE COURT: Reasonable, see -- well, you -- as I said, you just keep -- you keep going.
MR. CYRUS: Okay. Okay.
Q Mr. Wells, I don't want to belabor this point. But did

Ex. J, p. 8

you feel that statement by the officer saying that he was allowed a phone call only to an attorney and anything else had to be at Mat-Su Pretrial -- did you feel that raised a Zupnik issue or raised a denial of a phone call to a relative or a friend?
A I think the way you make the statement appear on -- by reading one statement out of an entire transcript is not reflective of the entire conversation that took place. No, in answer to the question. I -- I -- I -- I considered a Zupnik issue here just as I considered a Copeland issue here. They tend to go hand in hand.
Q Okay. So the answer is no, you didn't consider Zupnik in.....
MS. GERNAT: Your Honor, objection. Mr. Wells answered yes, he considered it. We are supposed to move on to the next.....
MR. CYRUS: All right.
MS. GERNAT: .....point.
A I think -- I think I responded twice, first to the judge that I considered, and secondly to you, Mr. Cyrus.
Q That you did consider this particular phrase raising a.....
MS. GERNAT: No.....
Q .....Zupnik (ph) issue?
MS. GERNAT: .....Your Honor.....

30

THE COURT: He can ask that question. I mean.....
Q This particular phrase raised a Zupnik issue to you?
A I considered not only that particular phrase, sir, but I considered the entire tape and the entire -- or should I say the entire exchange of dialog between Mr. Holden and the officer who did the DUI processing.
Q All right. And in your evaluation of that phrase, it was not a winnable motion, then?
A No.
Q Okay. And that -- and that's the bottom line. In fact, you -- I think your testimony was that you maybe even discussed that with Mr. Holden and.....
A I -- I -- I discussed this entire case with Mr. Holden. Again, I don't have my -- my -- my notes in front of me, but -- but I can tell you that Mr. Holden and I went over, A, all of the police reports, supplemental reports that came in, which would include the DUI processing tape, because it is always my practice to review audiotapes with clients. And if I don't personally review that with them, I always send a copy of the audiotapes to my clients in jail, just as I sent out 21 yesterday to another client.
Q Okay. So the answer is, you don't know whether you discussed this particular phrase with Mr. Zupnik.....
A Oh.....

31

Q .....with Mr. Holden?
A Oh, the entire tape was discussed with Mr. Holden, sir.
Q So did you specifically.....
MS. GERNAT: Your Honor, objection.....
Q .....bring this phrase.....
MS. GERNAT: .....asked and answered.
Q .....to his attention?
MS. GERNAT: Your Honor, asked and answered. Mr. Wells has said three times now, he went over the tape with Mr. Holden. They discussed the tape with Mr. Holden. He's thought about the Zupnik issue. He discussed it with Mr. Holden. We have been over this.
MR. CYRUS: My question is to this specific phrase, Judge.
MS. GERNAT: It's still objection. He's doing the same thing. He's trying to take the one thing out of context with -- Mr. Wells has already discussed this issue.
THE COURT: I believe the objection really is an asked-and-answered kind of thing.
MR. CYRUS: And I don't believe he has.
THE COURT: I'll let you ask it one last time.
MR. CYRUS: Okay.
Q This specific phrase, did you discuss that with Mr. Holden?
A I don't recall at this time, two years later, however long it's been, whether or not I took these six words out or whatever they are, and discussed those -- that particular phrase. What I did discuss with Mr. Holden, and my memory recalls, and it's generally fairly accurate, was that what I did was, I reviewed the entire tape with Mr. Holden and we discussed his issues. In particular we discussed his Copeland issue, which was foremost and burning. And secondly, we discussed as well what you refer to as Zupnik issue. And I described -- or -- and as a matter of fact, Mr. Cyrus, I told you that many months ago.

32

Q Well, wait a minute. You say you discussed with Mr. Holden the Zupnik issue?
A We -- we discussed a number of issues, sir.
Q Did you testify that before you you went to court, you test -- that you discussed with them a Zupnik issue?
A Before I went to court, did I discuss with Mr. Holden a Zupnik issue.....
Q Yes.
A .....is that what you're asking me specifically?
Q Yes.
A Did I discuss with him his right to be able to contact anyone that he so chose?
Q Yes.
A I believe so. I think we did.

33

Ex. J, p. 9

Case 3:06-cv-00093-TMB Document 18-11 Filed 11/13/2006 Page 9 of 15

Q Okay.
A I think that we discussed not only his right to call a lawyer, but anything else that came up in that context. We had numerous discussions. Mr. Holden was a client who I spent a lot of time with.
Q Did -- we're not disputing that. We're just disputing did you discuss with him.....
MS. GERNAT: Objection. Asked and.....
Q .....the Zupnik issue.....
MS. GERNAT: .....answered, Your Honor, numerous.....
Q .....and your answer is?
MS. GERNAT: .....times.
THE COURT: Sustained. He answered.....
Q Your answer.....
THE COURT: .....yes.
MR. CYRUS: Yes, all right.
THE COURT: It's -- the objection is sustained.
MR. CYRUS: All right, thank you.
A I mean, they generally -- Mr. Cyrus, I mean, as you well know, I mean, from doing defense work, Zupnik-Copeland tend to go hand in hand.
Q So -- and then was it a decision made by you then not to raise it, or did Mr. Holden tell you not to raise it?
A Well, two -- two things, actually. Mr. Holden only wanted to raise the issue of not being able to call an

attorney. I felt that that was somewhat of a stretch based on the exchange of the dialog between them. And secondly, was there ultimately a decision made by me as to whether or not to bring a Zupnik issue; of course there was, sir.
Q Okay. And so you ultimately made the decision?
A I made the decision not to.
Q Thank you.
THE COURT: Anything else for Mr. Wells?
MS. GERNAT: Oh, yes.
THE COURT: I should say, they do use the word reasonable. I'm looking at Cole v. State, which is the latest word from the trial -- from the Court of Appeals. The relevant standard is that the trial attorney's conduct fell outside the range of reasonable actions that might have been taken by an attorney skilled in the criminal law. That's the words they use. But in Rischer (ph) they make it very clear that they do not intend the court to second-guess what the trial attorney did.
MR. CYRUS: Oh, if it's unreasonable, Judge. If it's unreasonable, then it's.....
THE COURT: It -- there's -- yes. And they also in Rischer (ph) used the word, fell below the nadir.
MR. CYRUS: I.....
THE COURT: So.....

MR. CYRUS: Yeah. I.....
THE COURT: .....when they -- the word reasonable is not like the reasonable man standard here. It's a slightly different context, it seems to me.
MR. CYRUS: Within the field of -- yes, I agree.
THE COURT: Go ahead, Ms. Gernat.
MS. GERNAT: Thank you.

LANCE CHRISTIAN WELLS

testified as follows on:

REDIRECT EXAMINATION

BY MS. GERNAT:
Q Mr. Wells.
A Yes.
Q At the evidentiary hearing, was the issue about -- did Mr. Holden raise the fact that he didn't have a right to call a friend or relative?
A You know, I just don't recall, without seeing a copy of that transcript. It was a -- as I recall, it was broken down into two or three separate hearings.
Q Right.
A I just -- I don't recall. It's been too long. I just remember he testified for a significant period of time.
Q And in your experience as a criminal defense attorney and actually doing civil law as well, if you raise a case in a motion to reference it to support a point that you're

making, do you expect that the court will review that case to see what its holding is, and incorporate that argument into your brief?
A Well, I never know what the court's going to do. I -- I've often wondered. I mean, just -- I -- I -- I -- I -- I can't really answer that. I -- I think I'd be.....
Q Okay.
A .....guessing as to what.....
THE COURT: Judges often wonder the.....
Q Well.....
THE COURT: .....same thing about the lawyers, Mr. Wells.
A .....you know, we.....
Q Well, when you cite a case, you cite it for the -- I mean, you're citing a case because it has a certain holding.
A I -- I -- I do, or some type of legal proposition, yes.
Q Now, you commented and Mr. Cyrus didn't focus on it at all -- you said in your reply to the opposition you believed that you might have raised the issue about not being able to call a friend or relative?
A You know, as I recall, many months ago Mr. Payne I believe worked on this case in your office.
Q Uh-huh (affirmative).
A At some point I believe I saw his opposition. And it sticks in my memory that he refers to my motion. I don't

Ex. J, p. 10

have a copy of that opposition.
Q Okay.
A Maybe I looked at it in the court file, maybe I saw it because he was filing it one day or he asked me about it. But it sticks in my memory that -- that he referenced it as well that I had referred to it in my motion or my opposition or my reply. It's -- it's -- it's a little hard to remember.
Q So if I tell you that, to refresh your recollection, in your reply to the state's opposition to your motion you wrote: Defendant will testify that he was not given a phone book, that his hands remained cuffed behind his back, and that he was not allowed to call anyone, including a friend or family member, as allowed under existing.....
A Well.....
Q .....case law.....
A .....there.....
Q .....then that's what you would have said?
A If -- if -- if that's in the reply, then -- then that's what it says. Then -- then maybe it actually became an issue. Again, it's been a number of years since I've done this. And -- and unfortunately, neither parties provided me with any transcripts in this, so I'm really going from memory. But if that's what's in the brief,

then that's what's in the brief. I mean, it -- it -- I think it speaks for itself.
Q Right.
MS. GERNAT: Your Honor, I have -- I don't have anything further for Mr. Wells.
THE COURT:
MR. CYRUS: Okay. One followup question on that. If -- go ahead, I'm sorry.

LANCE CHRISTIAN WELLS

testified as follows on:

RECROSS EXAMINATION

BY MR. CYRUS:
Q If you raised Zupnik, and the trial court never got to it, why didn't you make a motion to reconsider it or have the court issue a ruling? Because the -- Judge Wells in her decision just went strictly on Copeland.
A I -- I don't recall the order from the court, sir.
Q All right, okay. But if the court had not addressed a Zupnik issue.....
A As -- as I recall.....
Q .....it would have been prudent.....
A .....the facts in Mr. Holden's testimony did not support that, sir.
Q All right, so.....
A Hmm, it -- it -- it may have been raised, but in

actuality as -- as -- as you know, as lawyers, sometimes we raise things which actually don't become issues, which we might perceive as issues before we actually go to court and before a witness testifies.
Q Right. All right, thank you, then. That's all I have.
VOIR DIRE BY THE COURT:
Q Am I understand -- this is the judge, Mr. Wells.
A Yes, sir.
Q Am I understanding you correctly that by the -- that to best of your recollection, by the time you got done with the evidentiary hearing, you didn't see the merits of an issue regarding Mr. Holden's ability to contact a friend or relative?
A As I recall, that's correct, sir.
THE COURT: Okay. Anything else for Mr. Wells?
MS. GERNAT: No, Your Honor.
MR. CYRUS: No.
THE COURT: No. Mr. Wells, you can either hang up or you can listen. It's up to you.
A Okay. I'll -- I'll hang up at this time.
THE COURT: Okay.
A Thanks, Judge. Bye-bye.
THE COURT: I needed to know your decision, yeah. All right, thank you.
MR. CYRUS: All right, we'll call.....

A Bye-bye, guys.
MR. CYRUS: We'll call Mr. Holden now, please.
(Witness excused)
THE COURT: Anything else from the state?
MS. GERNAT: No.
THE COURT: No? Yeah?
MS. GERNAT: Your Honor, I would note that the court told Mr. Cyrus this would be an hour. I do have other matters scheduled that I can't be here all the way to 12:00, as the court indicated. I asked the court how long to schedule this.....
THE COURT: Well, we got hung up by Mr. Cyrus.
MS. GERNAT: I know. I just have to be out of.....
THE COURT: We'll do our best.
MS. GERNAT: .....here at 11:45.
THE COURT: Oh, yeah, I don't see that.
MS. GERNAT: Okay.
THE COURT: I don't know how long the testimony's -- I can't imagine this is going to.....
MR. CYRUS: I don't imagine.....
THE COURT: .....take very long. Go ahead.
MR. CYRUS: Not that long.
MS. GERNAT: I don't ever trust that, coming from.....
MR. CYRUS: Well, we understand that.
THE COURT: Well, get up here, Mr. Holden.....

Ex. J, p. 11

MR. CYRUS: I'm bad at times.....
THE COURT: .....let's go.
MR. CYRUS: I'm bad at times, I agree. I agree.
(Witness summoned)
MS. GERNAT: And, Your Honor, I would ask that Mr. Cyrus not ask leading questions.....
THE COURT: That's fine. Mr. Holden, you need.....
MS. GERNAT: .....since this is direct.
MR. CYRUS: Sure, we'll try to avoid.....
THE COURT: .....to remain standing.....
MR. CYRUS: .....leading questions.
THE COURT: .....so you can be sworn in.
MR. HOLDEN: Yes, sir.
MR. CYRUS: We'll -- but we'll -- we'll just -- we'll ask open-ended questions then for him.
MS. GERNAT: Mr. Cyrus certainly knows how to.....
THE CLERK: (Indiscernible - simultaneous speech) right hand.
MS. GERNAT: .....ask direct questions.
(Oath administered)
MR. HOLDEN: So help me God, I do.

ERIC J. HOLDEN

called as a witness on his own behalf, testified as follows on:

DIRECT EXAMINATION

THE CLERK: Thank you, sir. You may be seated. Please state your full name for the record and spell your last name.
A Eric J. Holden, H-o-l-d-e-n.
THE CLERK: (Indiscernible - away from microphone).
THE COURT: That's fine.
THE CLERK: What is your occupation?
A Disabled -- Teamster, surveyor.
THE COURT: Go ahead, Mr. Cyrus.
BY MR. CYRUS:
Q All right, Mr. Wells was your.....
THE COURT: Stand up. Thank you. I ask lawyers to stand up when they.....
MR. CYRUS: Oh, I'm sorry.
THE COURT: .....address the court and witnesses.
MR. CYRUS: Yeah.
THE COURT: Thank you.
Q Mr. Holden, Mr. Wells was your attorney in the 00488 case, right?
A Yes, sir, and I believe another one right directly thereafter, which you took over.
Q Okay. While he was your attorney, there was a motion to dismiss the refusal count. Is that correct?
A Yes.
Q Okay. And before he filed that motion to dismiss the refusal count, do you remember whether you had any

conversations with him about your case?
A After listening to Mr. Wells on the -- on the telephone here, I believe the court is very, very well aware, as well as you, Mr. Cyrus, that anything done on my behalf, I like to take an active interest and -- and participate in. I've continually asked for -- what is it -- Oscar Cano (ph) representation or co-counsel, to where I would have an active participation in a case to where I could review case law authority and motions and discoveries, of which were not provided for me, and that's a number of reasons why Mr. Wells and I.....
MS. GERNAT: Objection. This is nonresponsive.....
A Okay, yes.
MS. GERNAT: .....to the question.....
MR. CYRUS: Okay.
MS. GERNAT: .....Your Honor.
Q Did you have a.....
THE COURT: That objection is sustained.
Q .....chance to discuss with him.....
A No, I did not. And I -- like I was trying to say, I would have addressed this issue specifically if I'd have known it would dismiss the case. You know, I -- I would have definitely.....
Q Right.
A .....addressed that issue.

Q Let me ask you one question. Do you -- had any discussions with Mr. Wells before the motion to suppress?
A One where he told me that -- that I better take a deal or -- you know, that's all he wanted to do, really, was -- then we didn't -- then we had a problem.
Q Okay. All right. But he did file a motion to suppress -- a motion to dismiss, excuse me.
A Yeah, I seen that.
Q Okay. And that was based upon denial of a phone call to you?
A The only phone call that I was allowed, yes.
Q Okay. Explain what you mean, the phone call that you were allowed?
A Well, the officer told me I was entitled to a phone call, and then he was.....
MS. GERNAT: Your Honor, I'm going to object. This is Mr. Cyrus getting to the issues -- what the court said we're not going to relitigate the merits. What Mr. Holden thinks.....
THE COURT: Well, I agree with the -- we -- Mr. Cyrus is correct that it has to be shown to be outside the reasonable actions.....
A Yes.
THE COURT: .....of the -- of what a competent attorney would do. I think Mr. Cyrus -- I think we all agree that --

Ex. J, p. 12

Case 3:06-cv-00093-TMB Document 18-11 Filed 11/13/2006 Page 13 of 15

[illegible] I have to at least evaluate that.....
[illegible] I was.....
THE COURT: .....but what Mr......
MS. GERNAT: And.....
THE COURT: What Mr. Holden thought was appropriate, I don't think really.....
MR. CYRUS: No, I agree with it.....
THE COURT: .....plays at all.
MR. CYRUS: No, but we're just trying.....
MS. GERNAT: And that was the question.
THE COURT: So I'll sustain the objection on that.....
MS. GERNAT: Right.
THE COURT: .....basis. What.....
[illegible] Yeah.....
THE COURT: Whether Mr. Holden thought it was a good [illegible] or not really isn't my issue.
MR. CYRUS: Right, I agree with you -- get that -- but we're just trying to get.....
THE COURT: With all due respect to Mr. Holden.
MR. CYRUS: Right.
[illegible] Did he discuss with you before you went to court anything [illegible] all? And it -- before you filed the motion to [illegible] -- dismiss?
[illegible]cally, all I remember Mr. Wells discussing with me, [illegible] tried to say, was that, you better take this deal or [illegible]

[illegible] going to slam you. That's about all I remember [illegible] -- I didn't get any of the motions. I just -- the [illegible] time I seen that motion is when you showed it to [illegible]
[illegible]
[illegible] I definitely wouldn't have waived a right that I [illegible] have -- that would have helped me. I mean, the [illegible] knows that. I.....
[illegible]ERNAT: Objection. Nonresponsive.....
[illegible]CYRUS: Well.....
[illegible]ERNAT: .....to the question.
[illegible]CYRUS: .....let me rephrase it again, okay.
[illegible]ally, you're familiar with the Zupnik issue now?
[illegible]
[illegible] familiar with the Zupnik.....
[illegible]RNAT: Your Honor, I'm going to object again. [illegible] doesn't matter what Mr. Holden thought in this issue. [illegible] Mr. Wells did or didn't do. Whether or not Mr......
[illegible]URT: I don't.....
[illegible]NAT: .....Holden knows about.....
[illegible]RT: I.....
[illegible]NAT: .....Zupnik doesn't matter.
[illegible]RT: I will sustain the objection as to the form [illegible]
[illegible]S: Okay.

Q Did Mr. Wells discuss with you Zupnik issues before the evidentiary hearing?
A No, sir.
Q And specifically, he never addressed with you, you're certainly welcome -- you -- if you want to call your attorney, you're certainly welcome to; anything else has to wait until you get to Mat-Su Pretrial. He never drew you to that sentence, am I correct on this?
A I wished he had. I wished I'd have known about this, but no, sir, he did not.
Q Okay. When you went and testified at your evidentiary hearing, then, you were not focusing in on any Zupnik issue then, is that correct?
A I wished I would have, sir, but no.
Q Okay. Did you ever get a copy of the decision by Judge Wells denying your motion to dismiss the refusal count?
A No, because we I believe pled out of court. So I never seen anything.
Q Okay.
A I -- I had a hard time getting any of my records.
Q All right.
A And the court -- I wrote letters to the court asking for them, too.
Q All right. And so you did not know about the Zupnik issue when the decision came down? When the decision

from.....
THE COURT: Which decision?
Q From Judge Wells's decision denying your motion to.....
A That's the first time I seen it is when you showed to me right there, Your Honor -- Mr. Cyrus.
Q So is it fair to say that you never yourself asked Mr. Wells to follow up and do a Zupnik decision?
A Boy, I wished I would have. I wished I'd.....
Q And the reason.....
A .....have known about it.
Q .....you didn't do it is for what reason?
MS. GERNAT: Objection. Leading.
THE COURT: No.
Q What is the reason you didn't do it?
A I was unaware of it, sir.
Q Okay. All right.
A I'm not a -- I'm not a lawyer.
Q All right.
MS. GERNAT: Objection.
Q Now.....
MS. GERNAT: Nonresponsive.
Q Now a few more questions here to do -- if Mr. Wells had talked to you about this proposition, if you want to call your attorney, you're -- welcome to; anything else has to wait -- what would you -- have been your response?

A Zupnik in a New York heartbeat minute.
Q Right. So what was -- did you want to call other people?
MS. GERNAT: Objection. Relevance.
A Yes, I did. I had to.
MS. GERNAT: Objection. Relevance.
THE COURT: What's the relevance, Mr. Cyrus?
MR. CYRUS: It's to show that this was a winnable motion and no reasonable attorney.....
THE COURT: What Mr. Holden thinks doesn't tell me whether it's a reasonable.....
MR. CYRUS: Well.....
THE COURT: .....motion.
MR. CYRUS: Well, in order to be a winnable motion, you have to decide if it's a winnable motion.
MS. GERNAT: That's not what the court.....
THE COURT: But what Mr. Holden.....
MS. GERNAT: .....does.
THE COURT: .....thinks is -- and it's not whether it's a winnable motion.....
A Can I -- I'll answer.....
THE COURT: .....alone.
A I can answer.
THE COURT: It's whether a reasonable -- a -- it was within the realm of reasonable choices. Whether I think it's winnable or loseable doesn't matter.....

MR. CYRUS: Well, actually I do.
THE COURT: .....unless I think it's utterly -- utter -- I mean, it has to be something that's pretty plain as the nose [illegible] your face, doesn't it? Otherwise I'm engaged in the [illegible]-guessing Rischer (ph) doesn't want. I don't decide [illegible] had I been in his place I would have brought the motion [illegible] I thought it was a winner. I don't do that.
[illegible] CYRUS: Well, in order to have prejudice, Judge, in [illegible] [illegible]pretation of Rischer (ph), you still have to decide [illegible] there was a winnable motion.
[illegible] COURT: I agree with you.
[illegible] CYRUS: Yeah.
[illegible] COURT: But I don't think I have to decide that it [illegible]
[illegible] CYRUS: Well, and the only way to.....
[illegible] COURT: .....you're -- the way you're phrasing it, [illegible] suggesting to me that if the judge thinks it was [illegible], it was therefore incompetent not to raise it. And I [illegible] believe that's the standard.
[illegible] CYRUS: If it's winnable and it was unreasonable [illegible] to raise it, then it's ineffective assistance of [illegible]. It has to be two prongs.
[illegible] COURT: That's right.
[illegible] CYRUS: We have to show it was winnable. In order to [illegible] winnable, we actually have to redo the evidentiary

hearing.....
THE COURT: No, you don't.
MS. GERNAT: No, you don't.
THE COURT: No, you don't. Because otherwise, these ineffective assistance -- case law. I shouldn't say no, you don't. You show me case law, I'll reopen the record. Give me a specific case that says in every single claim of ineffective assistance of counsel, in order to determine that there's ineffective assistance of counsel the trial court must reconduct the trial.
MR. CYRUS: No, must not reconduct the trial. Must determine that.....
THE COURT: That's what you just said.
MR. CYRUS: .....the motion was winnable.
THE COURT: No, no. That's just what you've just said, that in order to decide if it's winnable, you got to go through it all over again.
MR. CYRUS: Well, in this sense, yes.
THE COURT: Give me case law. Give me case law that I have to hear the witnesses, that I have to have the police officer back here, that I have to listen to the tape and I have to go through the whole darn thing in order to determine whether it's winnable.
MR. CYRUS: I think Rischer (ph).....
THE COURT: Rischer (ph) doesn't say that. You find

me -- you get Rischer (ph). Go to the law library, get.....
MR. CYRUS: No, I'll.....
THE COURT: .....the book out of the law library and show me specifically where in Rischer (ph) it says that.
MR. CYRUS: Well, they all say there's got to be.....
THE COURT: No, they don't.
MR. CYRUS: They all.....
THE COURT: Show me specific language that every single time there's a PCR, the judge has to reconduct the trial.
MR. CYRUS: Oh, no -- no, no, not every single.....
THE COURT: Well, that's what you just said.
MR. CYRUS: No, only on certain situations must there be a.....
THE COURT: No, you just said every single time. How do you determine it's winnable? Well, you're.....
MR. CYRUS: Well, let me do it the.....
THE COURT: .....digging this gigantic.....
MR. CYRUS: Let me do the.....
THE COURT: .....hole. I'm going to pull out the backhoe now, and let's begin again.
MR. CYRUS: Well, let.....
THE COURT: Explain to me the calculus the court uses in determining whether a case is winnable.
MR. CYRUS: Okay. Let me put it in the reverse way. If the court determines it's not winnable, there's no

Ex. J, p. 14

...URT: Yeah. How does the court determine it's not

...

...US: And that's where.....

...URT: No, no, no, no, no. Answer the question.

...US: Then you -- that's the -- that's where we --

...URT: Answer the question.

...US: You have to have an evidentiary hearing on

...

...URT: So in every single PCR where ineffective ... of counsel is raised, the judge conducting the ... required to call all the witnesses -- I mean, you ... the trial transcript because there's no way to ... credibility. So in other words, I'd have to have Mr. ... testify; we'd have to go find the officer that arrested ... he would have to testify; we would have to have ... else needs to testify; and we would basically conduct ... -- the evident -- I would have to reconduct Mr. ... evidentiary hearing.

...CYRUS: On this one point, yes. The answer is yes.

...COURT: How am I going to do it on this one point?

...CYRUS: Well, because the one point is that he was

...

...COURT: But how am I going to do it on one point

... doing the whole thing?

...CYRUS: Well, because the other points are res ... They've already been decided and we're not ... those.....

...COURT: But how do you have the hearing on whether or ... was a winnable issue, unless you have the whole darn ...?

...CYRUS: I agree. We -- I.....

...COURT: Cite me case law.

...CYRUS: Well, I'll.....

...COURT: I want a specific citation with a specific ..., and I want it in the next five minutes, because Ms. ... has to leave. I want a specific citation that in every ... PCR case -- because this is new to me -- that judges ... conduct PCR cases are now stuck reopen -- relitigating the ... And I'll note for the record, Mr. Cyrus, that it seems ... under the logic that you're addressing, that if we've ... PCR in a murder case, it looks like we have to hold the ... case all over again because there's no way to evaluate ... tactical choices of counsel in deciding whether or not to ... examine a particular witness or whether or not to ask a ... question of a particular witness, unless we yank ... witness in. And probably the judge can't evaluate the ... choices that counsel made without hearing the whole ... case, but otherwise you're doing it outside of context.

MR. CYRUS: Well, I agree -- context is correct, that you have to do with -- within the context.....

THE COURT: So how do I avoid -- I -- this is all news to me, Mr. Cyrus.....

MR. CYRUS: Well.....

THE COURT: .....I got to tell you.

MR. CYRUS: Well, I -- all I can say is I just did one hearing in front of Judge -- Dillingham judge.....

THE COURT: Case law.

MR. CYRUS: .....Judge Torrisi, and we did exactly the thing -- we.....

THE COURT: Case law. I want a citation.

MR. CYRUS: Yeah. I'm going to see if I can't find it real handy for you. Because I think.....

THE COURT: This is crazy. I'm sorry, I.....

MR. CYRUS: Well, there -- the.....

THE COURT: I can't imagine the Court of Appeals will make judges relitigate entire trials. I just can't picture it.

MR. CYRUS: That's why it goes back to the original judge. But since we don't have Judge Wells here, then -- so that -- that's the.....

THE COURT: Well, as you well know, in Anchorage the original judge almost never does the PCR.....

MR. CYRUS: Yeah, I agree. I agree.

THE COURT: .....because it's a civil matter.

MR. CYRUS: Yeah, I -- well, your -- they do now in Anchorage assign them to the judge that's assigned to the.....

THE COURT: But if they can't because the judge is retired, that means the new.....

MR. CYRUS: Then it goes to a new judge. In fact, Judge.....

THE COURT: And the new judge has to do the whole darn thing all over again?

MR. CYRUS: No. No, no. It depends on the issue.

THE COURT: Well, how do we do it, Mr. Cyrus, under.....

MR. CYRUS: On.....

THE COURT: .....your theory?

MR. CYRUS: On a suppression issue.....

THE COURT: You're not making any sense to me.

MR. CYRUS: On a suppression issue, you have to. Because here's what have to do. You have to.....

THE COURT: Well, Mr. Cyrus, what's the logical distinction between a suppression issue and an issue that a lawyer neglected to ask a question about DNA evidence when they were cross examining the DNA expert?

MR. CYRUS: Well, here.....

THE COURT: Don't you have to -- doesn't the DNA expert have to get back up there under your analysis so that the judge can hear exactly.....

Ex. J, p. 15